Filed 5/20/26  Chodniewicz v. ART.com CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOSHUA CHODNIEWICZ, et al.,<br><br>        Plaintiffs and Appellants,<br>v.<br>ART.COM, INC., et al.,<br><br>        Defendants and Respondents. | A172889<br><br>(Alameda County<br>Super. Ct. No. RG19001604) |

Plaintiffs Joshua Chodniewicz and Michael Marston are the founders of ART.com (ART), at one time one of the world's largest online sellers of artwork.  They are also shareholders of ART, and Chodniewicz serves on ART's board of directors.  In late 2018, with ART in declining financial health, ART's board—over Chodniewicz's objection—voted to approve the sale of substantially all of ART's assets to Walmart for $40 million.  In January of 2019, plaintiffs brought this lawsuit against Walmart, the other members of the board, and ART itself, requesting injunctive relief to enjoin the transaction.  That request was denied, and the sale of ART to Walmart closed in February 2019.  But plaintiffs' litigation continued, and continues ever since—a litigation now entering its eighth year, overseen by more than three different trial court judges, and generating along the way four iterations of plaintiffs' complaint, a clerk's transcript containing well over 100 volumes,

1

three writ proceedings,[1] a six-day trial, and a previous opinion of this court: *Chodniewicz v. ART.com, Inc.* (Sep. 29, 2021, A159720) [nonpub. opn.] (*Chodniewicz*).

In April 2020, ART's board unanimously—except for Chodniewicz's abstention—voted to elect two new independent directors, appointed those directors to a special litigation committee (the SLC), and empowered that committee to conduct an investigation into plaintiffs' lawsuit and determine whether it was in the best interests of ART to continue to pursue the claims alleged in it. And in November 2020, after a lengthy and thorough investigation, the SLC issued a 46-page report concluding that it was not. Shortly thereafter, the SLC—acting on behalf of ART—moved for summary judgment, seeking to terminate the litigation on the basis of its report. For eight months thereafter, plaintiffs took discovery regarding the SLC's independence, investigation, and conclusions. And in December 2021, the trial court denied the SLC's motion.

More discovery ensued, and the trial court eventually set a bifurcated bench trial to decide whether the SLC was independent, had conducted a reasonable investigation, and had reasonable bases for its conclusions. That trial ultimately took place over six days in June 2024. And in December 2024, the trial court issued a thorough, thoughtful, 13-page statement of decision granting the SLC's request to terminate this litigation, and entered judgment in defendants' favor. Plaintiffs again appeal, making several arguments, including that the trial on defendants' SLC defense should never have taken place, that such trial should have been by jury, and raising a

[1] (See *Chodniewicz v. Superior Court* (June 30, 2023, A168144); *Chodniewicz v. Superior Court* (Oct. 22, 2021, A160606); *Chodniewicz v. Superior Court* (Jul. 2, 2019, A156366).)

series of complaints regarding the SLC's investigative process and the bases for its conclusions regarding their claims. We conclude that none of plaintiffs' arguments has merit, and we affirm.

## BACKGROUND

In our previous opinion in this case, *Chodniewicz*, *supra*, A159720, we described some of the lengthy factual and procedural background as follows:[2]

"**The Parties**

"Plaintiffs and appellants Joshua Chodniewicz and Michael Marston are the founders of defendant and respondent ART, a Delaware corporation with its principal place of business in Emeryville, California, that was at one time one of the world's largest online sellers of artwork. Plaintiffs are also shareholders of ART, and Chodniewicz serves on ART's board, alongside six other directors: Dan Marriott (the chairman), Robert Kagle, David Quinlivan, Alan Spoon, Kira Wampler (the CEO), and Sharon McCollam.

"Four of ART's directors (the VC Directors) are also affiliated with venture capital firms (the VC Stockholders) who hold common and/or preferred stock in ART, specifically: Marriott is managing member of SG Growth Partners I, L.P.; Kagle is a general partner of Benchmark Capital Partners IV, L.P., and Benchmark Capital Partners V, L.P.; Quinlivan is managing member of each of the limited liability companies that control Saints Capital VI, L.P. and Saints Ventures II, L.P.; and Spoon is partner emeritus of Polaris Venture Partners IV, L.P. and Polaris Venture Partners Entrepreneurs' Fund IV, L.P.

---

[2] Because our previous opinion considered plaintiffs' appeal from an order sustaining certain defendants' demurrer to the third amended complaint, our description of the factual background was drawn from that complaint. (*Chodniewicz*, p. 2, fn. 1.)

3

"**The Walmart Transaction**

"In the first quarter of 2018, ART's CEO Wampler and CFO Chuck Kurth began to advise ART's board of directors to explore a sale of ART. According to the May 29, 2018 board minutes, 'the Board authorized the Company's officers to continue discussions with . . . third parties and to seek to elicit written acquisition offers from such parties.' And as early as March 2018, ART began supplying Walmart with confidential information related to a potential sale.

"On October 29, Walmart sent ART a letter of intent proposing that Walmart acquire ART's selected U.S. assets for a purchase price of $40,000,000, leaving ART with its international operations and all its liabilities. The proceeds from the transaction were 'to be used to pay creditors in full, leaving between $8,000,000–$10,000,000 for Management bonuses, Management severance payments, and distributions to VC Stockholders, yet distributing nothing to holders of common stock.' The letter of intent gave ART 24 hours to decide whether to accept its terms. It also contained a 'no-shop' restriction, preventing the board from entertaining any other offers for the sale of ART, and a 'no-talk' provision, preventing the board from entertaining unsolicited offers to purchase ART.

"The next day, over Chodniewicz's objection, the board voted to accept the terms of the letter of intent.

"Chodniewicz proposed an alternative to the Walmart transaction . . . . '[Chodniewicz] obtained millions of dollars in financial commitments to fund' this alternative transaction, including $1,800,000 from the board's chairman, Marriott. Chodniewicz obtained a written letter of intent from Clinton Phillips, a wealthy entrepreneur, who offered to infuse $15,000,000 into ART. He also spoke with Jason Caplain, who offered an

4

additional $2,000,000 on the condition that Chodniewicz assume control of the company.

"By December 5, Walmart had presented ART an asset purchase agreement, which was considered at a meeting of the board on December 5. Again over Chodniewicz's objection, the board approved the Walmart transaction. . . . [¶]

"Together with the board's approval, the VC Directors each executed a written consent to the Walmart transaction, 'giving written consent with respect to all shares of the Company's capital stock by such Stockholder in favor' of the transaction. On December 11, ART's CEO Wampler sent a notice to ART's shareholders regarding the transaction, stating that ART 'expects that substantially all or all of the proceeds will be used to pay its creditors. If any proceeds remain and the Company winds down its operations, the Company may make a modest distribution to the holders of Series B Preferred Stock, but it is expected that no proceeds will be available to make any distributions to the holders of Series A Preferred Stock, Series A-1 Preferred Stock or Common Stock.'

"**The Lawsuit**

"On January 7, 2019, plaintiffs Chodniewicz and Marston filed suit against ART, the individual members of the board of directors, and Walmart, alleging breach of fiduciary duty, breach of Delaware General Corporation Law section 124, aiding and abetting breach of fiduciary duty against Walmart, fraud and constructive fraud, and seeking declaratory relief. Plaintiffs sought a temporary restraining order and an injunction blocking the closing of the Walmart transaction." (*Chodniewicz, supra*, pp. 2–4.) They also demanded a trial by jury. The case was assigned to the Honorable Ronni MacLaren.

5

On January 30, Judge MacLaren denied plaintiffs' motion for a preliminary injunction.[3]  In so doing, she rejected plaintiffs' argument that "the asset sale . . . required the approval of a majority of Art.com common shareholders voting separately as a class," finding that ART's certificate of incorporation did not require such a vote "[o]n its face," and that the sale had been approved, as required under the certificate and Delaware law, by "holders of the majority of the outstanding shares of the common and preferred stock, voting together," and by 60% of the holders of certain series of the preferred stock, "as required by Article IV.A.2(d)(i)(C))" of the certification of incorporation.

Judge MacLaren also found that plaintiffs had failed to establish a reasonable probability of prevailing on their claims for fraud, which claims were based on two alleged misrepresentations, namely that the defendants had "[i]ntentionally misrepresented to the shareholders that the Board had unanimously approved the Walmart Transaction . . . when they knew that Mr. Chodniewicz as a director had voted against" it, and "intentionally misrepresented that the common shareholders did not have the rights to vote separately by themselves on the sale."  Judge MacLaren first noted that "[d]efendants concede that the reference to the unanimous approval was erroneous and contend that it was merely a typographical error," and that they had submitted unrebutted evidence that ART corrected the error by distributing and obtaining "corrected written consents from the nine

---

[3]    According to Judge MacLaren's order, "although [plaintiffs'] application was presented as an application for a temporary restraining order[,] on January 11, 2019, the Court continued the hearing to January 25 to allow the parties to fully brief the issues raised therein.  At the continued hearing date on January 25, counsel for all parties agreed that the application would be considered as a motion for preliminary injunction."

stockholders who signed the December 5, 2018 consent." Judge MacLaren further found that plaintiffs had not submitted any evidence that "any shareholder who voted to approve the asset sale was actually misled," and that "the only evidence submitted on that issue demonstrates that no shareholder was misled by that error."

Days later, specifically on February 14, plaintiffs filed a first amended complaint, now including the VC Stockholders as defendants. (*Chodniewicz, supra*, p. 5.) That complaint continued to allege claims for fraud and constructive fraud, as described above.

On April 24, Judge MacLaren granted defendants' motion to require plaintiffs to furnish a bond under Corporations Code section 800[4] by May 24, noting that plaintiffs' claim for breach of Delaware General Corporations Law section 124[5] was premised on their "contention that the sale of ART.com's assets to Walmart was required to be approved by a majority of the common shareholders of ART.com voting separately as a class," and rejecting that claim "for the same reason discussed in the Court's January 30, 2019 order denying Plaintiffs' motion for preliminary injunction." Plaintiffs did not post such a bond, and on May 31, Judge MacLaren ordered that plaintiffs' claims

---

[4] Corporations Code section 800 provides for such a bond, up to a maximum of $50,000, upon a showing that "there is no reasonable possibility" that prosecution of the cause of action alleged in the complaint will benefit the corporation or its shareholders. (See Corp. Code, § 800, subds. (c)(1), (e).)

[5] That section provides, as relevant here, that an act of a corporation may be challenged "by reason of the fact that the corporation was without capacity or power to do such act," either "(1) In a proceeding by a stockholder against the corporation to enjoin the doing of any act or acts or the transfer of real or personal property by or to the corporation," or "(2) In a proceeding by the corporation . . . acting . . . through stockholders in a representative suit, against an incumbent or former officer or director of the corporation . . . ."

7

for breach of Delaware General Corporations Law section 124 and for fraud and constructive fraud be dismissed as to ART and the seven individual defendants.

On May 3, Judge MacLaren sustained Walmart's demurrer to the first amended complaint with leave to amend, concluding that the 'no-shop' provision and sale price of the Walmart transaction were not per se breaches of the board of directors' fiduciary duties. (*Chodniewicz*, *supra*, p. 5.) And she ordered that "[i]n amending [their complaint], Plaintiffs may not base their aiding and abetting claim on any alleged failure by ART's board of directors to follow the voting requirement provisions in ART's Certificate of Incorporation," with reference to her January 30 and April 24 orders.

On June 12, plaintiffs filed their second amended complaint, which complaint continued to allege a sixth cause of action for fraud and constructive fraud, based on the same alleged misrepresentations already discussed.

From July 19 through July 23, defendants filed four separate demurrers to the second amended complaint; certain defendants also moved to strike plaintiffs' jury demand and prayer for punitive damages.

A hearing on defendants' demurrers was held on September 18. The next day, Judge MacLaren sustained defendants' demurrers to all plaintiffs' claims including two without leave to amend: plaintiffs' third cause of action for breach of Delaware General Corporations Law section 124 and sixth cause of action for fraud and constructive fraud, concluding that these causes of action "fail[ed] to state a legally viable claim for the same reasons discussed in the Court's prior Orders entered on January 30, 2019 and April 24, 2019. In addition, the Court already dismissed th[ese] cause[s] of action on May 31, 2019."

8

**The Operative Complaint**

On October 7, plaintiffs filed the operative third amended complaint (TAC), alleging five causes of action: (1) breach of fiduciary duty against the VC Directors as well as Wampler and Kurth; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the VC Stockholders; (3) aiding and abetting breach of fiduciary duty against Walmart; (4) constructive trust, disgorgement, and unjust enrichment against Walmart; and (5) declaratory relief against all defendants. (*Chodniewicz, supra*, p. 6.)

Defendants again filed demurrers to the TAC, but on December 23, Judge MacLaren overruled them, with the exception of the VC Stockholders' demurrer to the second and fifth causes of action, which Judge MacLaren sustained without leave to amend after concluding that plaintiffs had failed to allege that the VC Stockholders constituted a control group and thereby owed a fiduciary duty to minority shareholders. (*Chodniewicz, supra*, p. 7.) Because these causes of action were the only ones alleged against the VC Stockholders, Judge MacLaren ordered them dismissed from the case with prejudice, and judgment was entered in their favor that same day.

On January 6, 2020, the case was reassigned to the Honorable James Reilly.

On February 21, plaintiffs filed a notice of appeal of the judgment in the VC Stockholders' favor. And on September 29, 2021, we reversed, concluding that the TAC adequately alleged that the VC Stockholders aided and abetted the alleged breaches of fiduciary duty by the VC Directors. (*Chodniewicz, supra*, pp. 24–25.)

**The Special Litigation Committee and its Investigation**

Meanwhile, at an April 16, 2020 meeting, ART's board of directors— unanimously, with the exception of Chodniewicz's abstention—expanded the

9

number of directors from seven to nine, elected Matt Niehaus and Spencer Wells to serve as new directors, and appointed them to a special litigation committee (the SLC), "with full power and authority to exercise all of the power and authority of the Board in the management of the business and affairs of the Company with respect to [plaintiffs'] [l]awsuit, including the power and authority to investigate, review and analyze the facts and circumstances surrounding [plaintiffs' claims]," and to "take all actions as the [SLC] deems appropriate and in the best interests of the Company and its stockholders with respect thereto including, without limitation, the prosecution, control, and supervision of [plaintiffs'] [l]awsuit by the Company and, if determined to be appropriate, its settlement." These actions were taken pursuant to *Zapata Corp. v. Maldonado* (Del. 1981) 430 A.2d 779, 786 (*Zapata*), where the Delaware Supreme Court held that a corporation's board of directors may delegate its power to make decisions regarding corporate litigation "to an independent committee composed of disinterested board members," and that "committee can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest." (*Id*. at pp. 785–786.)

The SLC engaged the law firm of Farella Braun & Martel LLP (Farella) as counsel to assist in its investigation. Farella attorneys and staff spent 857 hours working on the SLC's investigation, including conducting a document review that lasted some two and a half months.[6] Farella "gathered approximately 200,000 emails, as well as electronic versions of hundreds of pages of corporate documents, board presentations, materials and minutes from approximately 35 Art.com Board meetings," ultimately providing some

---

[6] Farella billed $509,218.00 in fees and $24,517.25 in expenses for its services through October 31, 2020.

10

150 documents to the SLC. It also conducted 11 interviews of nine witnesses: Chodniewicz; the other six members of ART's board; ART's CFO Kurth; and Zuzana Gajduskova, Walmart's Director of Corporate Development, who oversaw the ART acquisition.[7] Farella produced an interview memorandum for each witness and provided those memoranda to the SLC.

On October 30, 2020, the SLC issued its 46-page report. After detailing the SLC's investigation, the report analyzed each of the five causes of action alleged in the TAC; plaintiffs' claim concerning the alleged disenfranchisement of common stockholders; and plaintiffs' claims for fraud, constructive fraud, and violation of Delaware General Corporations Law section 124. The report ultimately concluded that because of "the claims' lack of merit on the objective facts and the potential economic outlay required to pursue such claims . . . all the claims should be dismissed and the Derivative Litigation terminated. That outcome is the course of action which is in the best interests of the Company and its stockholders."

**The SLC's Motion for Summary Judgment**

The SLC's report was provided to the parties on November 5. And on November 11, the SLC moved for summary judgment, seeking to terminate the action on the basis of its report. According to the motion, it was brought by "[t]he Special Litigation Committee ('SLC') of Defendant International Walls, formerly known as Art.com, Inc.[,] and nominal defendant Art.com, Inc."

On January 27, 2021, Judge Reilly granted plaintiffs leave to take "limited discovery concerning the good faith and independence of the SLC and the basis supporting its conclusions," including depositions of Niehaus and Wells.

---

[7]     Kurth and Marriott were interviewed twice.

11

For the next eight months, plaintiffs took that discovery, and on August 11, filed their opposition to the SLC's motion. On August 20, the SLC filed its reply.

The motion came on for hearing on October 20, in advance of which Judge Reilly issued a tentative decision denying it. After the hearing, Judge Reilly took the motion under submission.

On December 18, Judge Reilly issued an order denying the SLC's motion, concluding that plaintiffs' evidence had created a triable issue of material fact "as to whether the SLC made a reasonable investigation into Plaintiffs' claims and had a reasonable basis for its conclusions."

**Preparation for the Phase One Trial**

At a case management conference on February 17, 2022, Judge Reilly ordered briefing on two questions: "(1) Is the SLC defense available at trial? (2) And if so, should the SLC defense be bifurcated and tried before Plaintiffs' claims on the merits?" And on February 24, the parties filed their briefs, plaintiffs arguing that in light of the denial of the SLC's motion for summary judgment, "the SLC has no continuing role in this case," and defendants arguing that the special litigation committee defense should be tried on the merits, and that such trial should be bifurcated from the merits of plaintiffs' claims and tried first.

A trial setting conference was held on March 23, and two days later Judge Reilly issued a written order agreeing with defendants, setting a "Phase One" bifurcated trial on the issues of "whether the [SLC] made a reasonable investigation into Plaintiffs' claims and (2) whether it had a reasonable basis for its conclusions" for October 24, 2022, with a second phase of the trial on the merits of plaintiffs' claims to take place, if necessary, on June 28, 2023. Judge Reilly set a case management conference for August

12

2 and ordered the parties to address, in their case management statements, the issue of "[w]hether Phase One of the trial will be a jury trial or a court trial."

The parties filed their case management statements on July 18, defendants arguing that the trial should be a court trial because "[a] shareholder derivative action alleging breach of fiduciary duty by the corporate directors is an equitable action for which there is no right to a jury trial," and plaintiffs arguing that "under California law, a trial on the reasonableness of an investigation and conclusions that result in a forfeiture of assets, is to be before a jury."

A trial setting conference was held on October 24, and on November 1, Judge Reilly ordered that the Phase One trial would take place in June of 2023, and "shall be conducted as a bench trial."

The Phase One trial was subsequently reset several times, and beginning in November 2023, the action itself was repeatedly reassigned, until it was assigned to the Honorable Peter Borkon on March 1, 2024, who maintained the then-existing trial date of June 17, 2024.

**The Phase One Trial**

The Phase One trial took place over six court days between June 17 and 25. The witnesses for the defendants were Wells; Sarah Good of Farella; Niehaus; and Chodniewicz (over plaintiffs' objection), pursuant to Evidence Code section 776.[8] Jason Caplain testified briefly for the plaintiffs.

On November 13, Judge Borkon issued a tentative decision, a decision that was thorough indeed, 13 single-spaced pages. He concluded that "the

---

[8]     Defendants also introduced a short video clip from Marriott's deposition.

SLC conducted a reasonable investigation of Plaintiffs' claims," that it "had a reasonable basis for its conclusions," and that "[u]nder *Zapata*, [*supra*, 430 A.2d 779,] this matter should be terminated as recommended by the SLC in the SLC Report and requested at trial."

On December 4, plaintiffs filed objections to the tentative decision, but did not request a hearing, asserting that "given the number of errors in the court's Tentative, the Plaintiffs do not believe a hearing is necessary as it would not be productive."

On December 20, Judge Borkon adopted his tentative as his final statement of decision.

Judgment in favor of defendants was entered on January 8, 2025, from which plaintiffs filed a notice of appeal.

## DISCUSSION

### *Zapata* and the Special Litigation Committee Defense

As the Delaware Supreme Court recently explained, under *Zapata*, *supra*, 430 A.2d 779, "an SLC's decision to dismiss a derivative lawsuit is not subject to the business judgment rule standard of review. Instead, we applied a higher standard of review because the SLC's motion 'is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself.' [Fn. omitted.] To meet its burden, 'the SLC must show . . . that no disputed issues of material fact exist about the independence, good faith, and reasonableness of the SLC's investigation and whether the SLC had reasonable bases for its conclusions.' [Fn. omitted.] And, as a second discretionary step, the court can apply its own business judgment and decide whether dismissal or settlement is in the

14

corporation's best interests." (*In re Oracle Corp. Derivative Litigation* (Del. 2025) 339 A.3d 1, 14; see *Zapata*, pp. 788–789.)

"A motion to dismiss brought in response to a report of an SLC is a hybrid motion created by *Zapata* which takes qualities from a . . . motion to dismiss and a . . . motion for summary judgment." (*Sutherland v. Sutherland* (Del. Ch. 2008) 958 A.2d 235, 238; see *Kaplan v. Wyatt* (Del. Ch. 1984) 484 A.2d 501, 506–507 [*Zapata* motion is a "hybrid one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement . . . and to a motion . . . whereby a plaintiff unilaterally seeks a voluntary dismissal of the complaint subsequent to the filing of an answer by the defendant"].) And "*Zapata*'s first prong is subject to a summary judgment standard." (*Kahn v. Kolberg Kravis Roberts & Co., L.P.* (Del. 2011) 23 A.3d 831, 840–841.)

**Plaintiffs' Arguments and Principles of Appellate Review**

Plaintiffs' opening brief makes five arguments, certain of which contain several sub-arguments.

First, in an argument entitled, "Pre-Phase I Trial Errors Mandating Reversal," plaintiffs make four sub-arguments: that (1) the trial court should have "dismiss[ed] the SLC claims when it denied the SLC's [motion for] summary judgment"; (2) the trial court erred in "conduct[ing] a trial on the SLC's rejected motion for summary judgment under California procedural law instead of returning the case to [plaintiffs] for trial on the merits" of their claims; (3) they were denied their "constitutional right to a jury trial, if there was to be a bifurcated Phase 1 trial"; and (4) the "improper bifurcated Phase 1 trial" should have been "conducted by the accused defendants instead of the SLC."

Second, plaintiffs argue that ART's certificate of incorporation entitled them to vote separately as a class on the proposed transaction with Walmart,

15

that failure to hold such a vote was "inconsistent" with historical practice, violates "common sense," rendered the sale "illegal and void as a matter of law," and "negates the Phase 1 trial in its entirety."

Third, plaintiffs argue that "dismissal of [their] fraud and punitive damages claims [was] reversible error."

Fourth, plaintiffs argue that "the trial court erred in dismissing [their] right to a jury trial on their fraud and contract claims."

Fifth, in a final argument entitled, "Phase 1 Trial Errors Mandating Reversal," plaintiffs make sub-arguments that: "the SLC conducted an unreasonable and badly flawed investigation"; "the SLC and the Borkon Order Got The Undisputed Facts Regarding ART's International Operations Wrong"; and "the SLC Did Not Understand That The Board's Duties Ran Only to Shareholders, Not Creditors And Certainly Not Employees."

Before turning to plaintiffs' arguments, we pause briefly to reiterate some basic principles of appellate briefing and review. We do so because, as will be seen, these principles are dispositive of many of plaintiffs' arguments.

The first—and most fundamental—principle of appellate review is that "A judgment or order of the lower court is *presumed* correct. All intendments and presumptions are indulged to support it . . . and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) One of those presumptions is that the record has sufficient evidence to sustain the trial court's findings of fact. (E.g., *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) As we have put it, " 'Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' [Citation.]" (*In re*

16

*Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531; see *Universal Home Improvement, Inc. v. Robertson* (2000) 51 Cal.App.5th 116, 125–126.)

Furthermore, "[a]ppellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' " (*Nelson v. Avondale Homeowners Association* (2009) 172 Cal.App.4th 857, 862.) "We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; see also *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2; *People v. Stanley* (1995) 10 Cal.4th 764, 793; Cal. Rules of Court, rule 8.204(a)(1)(B) [appellants' brief must "support each point by argument and, if possible, by citation of authority"].)

Against that background, we turn to plaintiffs' arguments.

### Plaintiffs Have Failed to Demonstrate Error Before the Phase One Trial

As noted, the SLC brought its *Zapata* motion as one for summary judgment, which motion the trial court denied. And plaintiffs do not dispute that once the trial court found the existence of one or more triable issues of material fact, the California procedure is that those issues be resolved by trial on their merits. (See, e.g., *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1162–1163 [concluding that homeowners association's SLC defense "must be allowed" when the SLC has recommended dismissing a derivative action, "if possible, on motion, but if necessary, in a full trial"]; *Will v. Engebretson & Co.* (1989) 213 Cal.App.3d 1033, 1041–1044 [plaintiff entitled to "trial on the merits . . . regarding the issue of the good faith and

17

independence of the committee" after trial court found triable issues on motion for summary judgment based on *Zapata*].)

And as to that procedure, as our colleagues in Division Four confirmed the law, "It is well established that while the courts generally enforce the substantive rights created by the laws of other jurisdictions, the procedural matters are governed by the law of the forum. (*Bernkrant v. Fowler* (1961) 55 Cal.2d 588; *Grant v. McAuliffe* (1953) 41 Cal.2d 859; [citations].) As defined in the case law, the terms 'practice' and 'procedure' include the mode of procedure by which a legal right is enforced as distinguished from the substantive law which gives or declares the right. [Citations.]" (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012, fn. omitted; accord, *Airs Aromatics, LLC v. CBL Data Recovery Technologies, Inc.* (2020) 50 Cal.App.5th 1009, 1016.)

Faced with this, plaintiffs argue, however strainedly, that the question of whether a trial on the merits should have followed denial of the SLC's motion for summary judgment is a substantive one, and thus Delaware law applies. Even if this were correct, it would not avail plaintiffs, as they have failed to demonstrate that Delaware law required the trial court to entirely dismiss defendants' SLC defense after finding that it presented "triable" issues of material fact. Plaintiffs cite no case so holding.[9] Indeed, *Zapata*

---

[9] Plaintiffs' reliance on *Johnson v. Hui* (N.D. Cal. 1991) 811 F.Supp. 479 is not persuasive. There, the defendant corporation moved to terminate shareholder derivative litigation pursuant to *Zapata* based on the recommendation of a SLC. (*Id.* at p. 483.) In explaining why it would treat the motion as one brought under Federal Rule of Civil Procedure 23.1, governing shareholder derivative actions, rather than as a motion for summary judgment under Federal Rule of Civil Procedure 56, the court stated that "where courts have denied a *Zapata* motion to terminate . . . the movant has not retained a right to proceed to a full bench trial of the issues raised by the motion to terminate," and opined that such "limitation is in

18

itself indicated the contrary, noting in a footnote that, with respect to the "limited issues presented" by a motion to dismiss based on an SLC's report, "we do not foreclose a discretionary trial of factual issues[,] but that issue is not presented in this appeal." (*Zapata*, *supra*, 430 A.2d at p. 788, fn. 15.) As the Delaware Supreme Court expressly confirmed, albeit in an unpublished disposition, "*Zapata* explicitly held open the possibility that the Court of Chancery, when considering a special litigation committee's motion to terminate derivative litigation, might hold 'a discretionary trial of factual issues.'" (*In re Hughes* (Del. 2024) 2024 Del. LEXIS 34 [table].)

For the contrary proposition, plaintiffs rely on *London v. Tyrrell* (Del. Ch. Mar. 11, 2010) 2010 WL 877528 (*London*) and *Kaplan v. Wyatt* (Del. Ch. 1984) 484 A.2d 501, 509 (*Kaplan*). Such reliance is misplaced.

In *London*, the Court of Chancery, after finding material questions of fact regarding the SLC's independence, good faith and whether the grounds upon which it recommended dismissal of the lawsuit were reasonable, denied an SLC's motion to dismiss, concluding that "plaintiffs may continue to pursue this action." (*Id.* at p. *1, *9–*11; see *id.* at p. *11 [characterizing the question presented as "whether the suit should be dismissed or permitted to proceed"].) In setting forth the applicable law, *London* made the statement

_____

accord with the underlying efficiency rationale of the *Zapata* rule." (*Id.* at p. 485.) But because the court went on to grant the motion to terminate (*id.* at p. 491), its discussion of what might follow denial of such a motion was dictum. In any event, to the extent that *Hui*—a 34-year old federal case— suggests that defendants were not entitled to a trial on the merits of their SLC defense following denial of the SLC's motion for summary judgment under Delaware law, we do not find it persuasive, and we decline to follow it. (See *Karuk Tribe of Northern California v. California Regional Water Quality Control Board* (2010) 183 Cal.App.4th 330, 352 [decisions of the lower federal courts are not binding on California Courts of Appeal, even on questions of federal law].)

19

on which plaintiffs here rely, that "When an SLC's motion to dismiss is denied, control of the litigation is returned to the plaintiff shareholder," with citation to *Kaplan*. (*London*, p. \*12.) But *London* had no occasion to—and did not—consider or address the question presented here, whether defendants would be entitled to a trial on the merits of their SLC defense after denial of their motion under *Zapata*. (See *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 23 [observing the "rule that ' "cases are not authority for propositions not considered" ' "].)

In *Kaplan*, the plaintiff filed a shareholder derivative action without having made a pre-suit demand upon the board of directors; the board appointed a special litigation committee to investigate the allegations of the complaint; and the Court of Chancery granted the committee's motion to dismiss. (*Id.* at p. 521.) Plaintiffs' citation to *Kaplan* includes a parenthetical that states: "If there is a material factual question about these issues causing doubt about any of these grounds, I read *Zapata* and its progeny as requiring a denial of the SLC's motion to terminate." This language does not appear at all in *Kaplan*.[10] We could stop here and decline to analyze *Kaplan* further, as "[w]e are not bound to develop appellants' argument for them." (*In re Marriage of Falcone & Fyke*, *supra*, 164 Cal.App.4th at p. 830.) In any event, the language at issue says nothing about the question here—what should *follow* denial of an SLC's *Zapata* motion—and even if it did, given that *Kaplan granted* such a motion, any such language would have been the purest dictum.

We turn next to plaintiffs' argument that the Phase I trial should have been by jury. Plaintiffs first assert that "the reasonableness of the SLC's

---

[10] It appears to be from *In re Oracle Corp. Derivative Litigation* (Del. Ch. 2003) 824 A.2d 917, 929.

20

investigation and conclusions [is] a purely legal inquiry," and then cite, without discussion or analysis, two cases: *In Nationwide Biweekly Admin., Inc. v. Superior Court* (2020) 9 Cal.5th 279 and *People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283. These cases do not involve shareholder derivative litigation, Delaware law, a special litigation committee, or anything like the circumstances here.[11] Instead, and at best, they stand for the hornbook law proposition that "the *form* or *title* of a statutory cause of action is not controlling and . . . . ' "[a] jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law." ' " (*Nationwide*, p. 315, quoting *One 1941 Chevrolet*, p. 299.) Why a determination of the reasonableness of the SLC's investigation and the bases for its conclusions is such an action—especially when the underlying derivative action is not—plaintiffs do not explain. (See *Diep derivatively on behalf of El Pollo Loco Holdings, Inc. v. Trimaran Pollo Partners L.L.C.* (Del. 2022) 280 A.3d 133, 149 [noting that shareholder derivative action "developed in equity"], quoting *Aronson v. Lewis* (Del. 1984) 473 A.2d 805, 811, overruled on other grounds by *Brehm v. Eisner* (Del. 2000) 746 A.2d 244, 253.)

Similarly, in support of their argument that the trial court erred by "allow[ing defendants] . . . to conduct the trial on the SLC's unsuccessful summary judgment motion in place of the SLC and its counsel," plaintiffs

---

[11] *Nationwide* held that in "causes of action under the [Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.)] or the [False Advertising Law (Bus. & Prof. Code, § 17500 et seq.)] seeking injunctive relief and civil penalties, the gist of the actions is equitable, and there is no right to a jury trial in such actions under California law either as a statutory or constitutional matter." (*Nationwide*, p. 334.) And *One 1941 Chevrolet Coupe* held that the owner of an automobile that was allegedly used to transport marijuana had a right to trial by jury in a forfeiture proceeding brought by the People pursuant to the Health and Safety Code. (*One 1941 Chevrolet Coupe*, pp. 285–286, 300.)

21

cite, again without any discussion or analysis (or even a parenthetical), only *Safer v. Superior Court* (1975) 15 Cal.3d 230. There, our Supreme Court held that "a court acts in excess of its jurisdiction when it permits a district attorney to disregard the statutory confines of his authority by prosecuting under the Code of Civil Procedure a contempt stemming from a civil litigation in which the district attorney could rest his participation neither upon standing as a party nor upon statutory authorization." (*Id*. at p. 233.) It hardly needs saying that this is manifestly inadequate to carry plaintiffs' burden to demonstrate that the judgment below was in error.

**Plaintiffs' Voting Rights Argument Fails**

Plaintiffs next renew their argument that the Walmart transaction required approval of a majority of the common stockholders of ART, voting separately as a class. As noted, Judge MacLaren rejected this argument on four separate occasions. The SLC considered the argument as well, and after observing that "[t]he Superior Court's prior orders provide an extensive analysis of the required voting procedures," concluded that, "[a]s the Superior Court outlined repeatedly on several occasions, the Plaintiffs' contention is baseless and contradicted by the plain text of Art.com's Amended and Restated Certificate of Incorporation."

Undeterred, plaintiffs argue that the interpretation of ART's certificate of incorporation is an issue of law that we review de novo, and that defendants' "repeated reliance on what the trial court previously 'found' is legally irrelevant." Fair enough. But we agree with Judge MacLaren.

Plaintiffs' argument is based on § IV(F)(2)(a) of ART's certificate of incorporation. Section F describes the "rights, preferences, privileges, restrictions and other matters relating to the Preferred Stock," subsection (2) is titled, "Voting Rights," and subsection (a) is titled, "General Rights," and begins as follows: "Except as otherwise provided herein or as required by

22

law, the Preferred Stock shall vote together with the Common Stock at any annual or special meeting of the stockholders and not as a separate class, and may act by written consent in the same manner as the Common Stock, in either case upon the following basis," going on to describe how the number of votes afforded to each holder of shares of preferred stock are to be calculated. (§ IV(F)(2)(a).)

Subsection (d) of the "Voting Rights" section is titled, "Protective Provisions," and its first subsection (i) provides: "The Corporation shall not (by amendment, merger, consolidation, reclassification or otherwise), without first obtaining the approval (by vote or written consent, as provided by law) of each of (x) the holders of at least sixty percent (60%) of the then outstanding shares of Series A Preferred, Series A-1 Preferred and Series B Preferred, voting together as a single class and on an as-converted basis, and (y) the holders of at least sixty percent (60%) of the then outstanding shares of Series B Preferred, voting together as a single class and on an as-converted basis, take any action that: . . . [¶] . . . [¶] . . . . (C) results in any Acquisition or Asset Transfer (each term as defined in Section 3(b) herein) . . . ." (§ IV(F)(2)(d)(i), (c).)

The parties agree that the Walmart transaction was such an "Acquisition or Asset Transfer," thus requiring the approval of the holders of 60% of certain series of the preferred stock as set forth in § IV(F)(2)(d)(i). But plaintiffs assert that such vote of the preferred stockholders triggered the "Except as otherwise provided herein" language of § IV(F)(2)(a), arguing that language means that while the preferred and common stock normally vote together, because the certificate of incorporation requires approval from the preferred stockholders for certain transactions, with respect to those transactions, "the Preferred votes by itself as a separate class, *as does*

23

*common*," and that "when preferred stock votes, it either votes with the common or by itself as a separate class. It does not both vote together with common and then again as its own separate class." (Emphasis added.) We disagree.

As the Delaware Court of Chancery explained in *In re Trados Inc. Shareholder Litigation* (Del. Ch. 2013) 73 A.3d 17: "By default, 'all stock is created equal.' [Citation.] Unless a corporation's certificate of incorporation provides otherwise, each share of stock is common stock. If the certificate of incorporation grants a particular class or series of stock special 'voting powers, . . . designations, preferences and relative, participating, optional or other special rights' superior to the common stock, then the class or series holding the rights is known as preferred stock." (*Id*. at pp. 38–39.)

Thus, it is part of the very definition of "preferred stock" that the holders of such stock can enjoy " 'voting powers . . .' *superior* to the common stock." (*In re Trados Inc. Shareholder Litigation, supra,* 73 A.3d at p. 58 (emphasis added).) Such is clearly the case here, where the certificate of incorporation provides that, in addition to the approval of "the majority of the outstanding stock of the corporation entitled to vote thereon" (as required by Delaware General Corporations Law section 271, subdivision (a)),[12] certain transactions must also be approved by the holders of 60% of certain series of the preferred stock. As noted, this requirement appears in a section entitled "Protective Provisions," itself within a section that describes the "rights, preferences, privileges, restrictions and other matters relating to the

---

[12] This requirement is triggered where a corporation intends to sell "all or substantially all of its property and assets." (8 Del. C. § 271, subd. (a).)

24

Preferred Stock," and that contains various other provisions clearly addressed to protecting the rights of preferred stockholders.[13] (§ IV(F)(2)(d).)

But by granting preferred stockholders the right to vote separately as a class on certain actions, the certificate of incorporation does not divest those stockholders of their "default" voting rights as holders of the corporation's stock—at least not by implication in the way that plaintiffs suggest. Indeed, by plaintiffs' logic, any attempt to draft the certificate of incorporation so as to both make exceptions to the requirement that common and preferred always vote together ("Except as provided herein . . .") *and* grant preferred stockholders the right to vote separately on certain corporate actions would, by triggering the language on which plaintiffs rely, automatically grant the holders of common stock the right to vote separately on those same actions. As defendants aptly put it, this simply "makes no sense."[14] And it finds no support in the text of the certificate of incorporation—or in any authority provided by plaintiffs.[15]

---

[13] These include, for example, requiring approval from holders of 60% of a given series of preferred stock for any action that "alters or waives any of the rights, preferences or privileges of such series of Preferred Stock," or "increases or decreases the number of authorized shares of such series of Preferred Stock." (§ IV(F)(2)(d)(ii)(A), (B).)

[14] Nor does our interpretation render the "Except as otherwise provided herein" language surplusage, because the certificate of incorporation elsewhere explicitly provides for the holders of common stock to vote separately as a class. For example, § IV(F)(2)(b) of the certificate, titled "Election of Board of Directors," provides in part that "The holders of Common Stock, voting together as a separate class, shall be entitled to elect two (2) members of the Corporation's Board of Directors at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors."

[15] Plaintiffs' reliance on *Warner Communications Inc. v. Chris-Craft Industries, Inc.* (Del. Ch. 1989) 583 A.2d 962 is unavailing. There, the

25

**Plaintiffs Have Not Demonstrated Error in the Dismissal of their Claims for Fraud, Constructive Fraud, or Punitive Damages**

As noted, plaintiffs' third argument is that dismissal of their fraud and punitive damages claims was error, and their fourth argument is that the trial court erred in "dismissing [their] contract claims and, as a result, denying [them] a jury trial on the issue," and "[s]imilarly," that they "were entitled to a jury trial on their wrongly stricken fraud claims."

With respect to plaintiffs' claims for fraud and constructive fraud, as noted—and as plaintiffs concede—those claims were "in large part based on allegations that defendants intentionally misrepresented that the common stockholders did not have independent voting rights as to the Transaction."[16] Because we have concluded that the holders of ART's common stock did not have such independent voting rights, plaintiffs' fraud claims fail, and Judge MacLaren did not err in sustaining defendants' demurrer to those claims.

---

Warner certificate of incorporation stated that "[e]xcept as otherwise . . . provided, the shares of Series B Stock and the shares of Common Stock . . . shall be voted together as one class," but the Series B Preferred stock's certificate of designation contained two provisions requiring that the preferred stock vote as a class on certain transactions that "adversely" affected their rights. (*Id.* at pp. 964–965.) The question before the court was whether the "back end" of a proposed merger transaction would trigger either of these two provisions, and the court concluded that it would not. (*Id.* at pp. 963–964.) *Warner* had no occasion to—and did not—consider any argument like the one plaintiffs make here, that the provision requiring preferred stockholder approval of certain transactions entitled the common stock to vote separately on those same transactions separately as a class.

[16] Plaintiffs' opening brief makes no mention of their allegation that ART's board committed fraud by "[i]ntentionally misrepresent[ing] to the shareholders that [it] had unanimously approved" the Walmart transaction; accordingly, we treat any argument regarding that allegation as waived. (See *West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1187, fn. 2.)

And as plaintiffs likewise concede, their fraud claims "provided the basis for an award of punitive damages," meaning that there was no error in striking their demand for such damages. (See Civ. Code, § 3294, subd. (a).) Similarly, because plaintiffs' fraud claims fail, so does their argument that they were denied their right to trial by jury on those claims.[17]

### Substantial Evidence Supports the Trial Court's Findings Regarding the SLC's Investigation and Conclusions

In the final section of plaintiffs' brief, entitled, "Phase 1 Errors Mandating Reversal," they make various complaints about the adequacy of the SLC's investigation. Plaintiffs take issue with the SLC's document collection, arguing that it was not "reasonable" because "[n]o particular documents were requested, and no follow up requests were ever made," the SLC "fail[ed] to insist that Walmart produce any documents," and similarly "fail[ed] to press the VC Defendants for documents and communications." They argue that "culling" the documents that the SLC did collect down to a set of some 150 documents "was not reasonably designed to provide [the SLC] with the necessary information to conduct [an] 'in depth inquiry' into all of plaintiffs' claims." And they go on to complain that the SLC members did not attend certain witness interviews, and interviewed "only parties," "constitut[ing] a disabling 'prejudging' of the merits."

With respect to the SLC's conclusions, plaintiffs argue that "the SLC did not understand the APA's impact on ART's international operations,"

---

[17] Plaintiffs also assert that "the trial court erred in dismissing [their] contract claims," and "[t]o the extent that this Court determines that there are fact issues as to the meaning of the Charter, a creature of contract, then [they] were entitled to but denied a jury trial on these issues." We do not understand these arguments, as plaintiffs never alleged any contract claims. But in any event, any such claims based on the voting provisions of the certificate of incorporation would fail, for the reasons already discussed.

calling "demonstrably false" the statement in the SLC's report that it "could not substantiate the allegation that Art.com committed corporate waste by agreeing to shut down its international business because WMT so demanded." And they assert that the SLC "did not understand that the board's duties ran only to shareholders, not creditors and certainly not employees" (capitalization omitted), pointing to a portion of a single sentence from the minutes of the December 5, 2018 board meeting, at which the Walmart transaction was approved, mentioning the board's "duties to consider the new third-party offer, and to evaluate it with a view to maximizing the value of the Company and its assets for the benefit of stockholders *and creditors . . . .*" (Emphasis added.)

As we stated in plaintiffs' first appeal, albeit in a different context: "Such nitpicking is not availing." (*Chodniewicz, supra,* A159720, p. 23.)

To begin with, with respect to plaintiffs' complaints about the SLC's document collection and the failure of the SLC members to attend every interview, and as Judge Borkon noted, the SLC's "efforts compare favorably to those approved in Delaware cases." (See, e.g., *In re Carvana Co. Stockholders Litigation* (Del. Ch. Mar. 27, 2024) 2024 WL 1300199, pp. *4–*5 [finding seven-month SLC investigation that reviewed 100,000 pages of documents and interviewed 16 witnesses reasonable in scope]; *In re Baker Hughes, a GE Company, Derivative Litigation* (Del. Ch. Apr. 17, 2023) 2023 WL 2967780, p. *17 [100,000 documents and 22 witness interviews].) And the fact that the SLC members did not attend every witness interview— interviews that, as Judge Borkon also noted, took place "in the height of the Covid-19 pandemic"—does not invalidate the SLC's investigation either. (See *Katell v. Morgan Stanley Group, Inc.* (Del. Ch. June 15, 1995, No. 12343) 1995 WL 376952, pp. *9–*10 [finding investigation reasonable where SLC did

28

not attend any interviews and noting "heavy reliance on . . . competent attorneys does not render [the SLC's] investigation unreasonable"]; *In re Carvana, supra*, 2024 WL 1300199, pp. *10–*12 [finding investigation reasonable where SLC attended 7 of 16 witness interviews].) Likewise unavailing is plaintiffs' focus on minutiae from the December 5, 2018, board minutes. (See *In re Baker Hughes, supra*, 2023 WL 2967780, at p. *20 ["The SLC's failure to focus on specific documents the plaintiffs would have highlighted does not invalidate the SLC's investigation"].)

But plaintiffs' arguments fail for a more fundamental reason: their appeal is not (and cannot be) from the SLC's report, but from the judgment in favor of defendants entered pursuant to Judge Borkon's decision, after a trial where he sat as the finder of fact, a six-day trial that generated close to 1,500 pages of reporter's transcript and eight boxes of exhibits. But to read plaintiffs' brief, and especially its final argument, one would hardly realize such a trial ever took place. And entirely missing from plaintiffs' 11 pages of argument regarding the SLC's process and report is any mention of the standard of our review of the judgment on appeal, which, as defendants point out, is for substantial evidence.[18] We are thus "bound by the '. . . principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660; see *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

---

[18] Indeed, the phrase "substantial evidence" appears only once in plaintiffs' 73-page opening brief.

29

Furthermore, to the extent plaintiffs contend that " 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point, and *not merely their own evidence.*' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark*).) " 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.*' " (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) " 'Unless this is done the error is deemed to be waived.' " (*Foreman & Clark*, *supra*, p. 881.)

Plaintiffs' final argument makes some four references to Judge Borkon's statement of decision, calling it "conclusory," "devoid of accurate supporting facts," "troubling," and "beyond unreasonable" in its failure to agree with their argument regarding the purchase agreement's effect on ART's international operations "as a matter of law." But they cite only two of the statement of decision's findings of fact—that the SLC's report "tackled" the allegations regarding ART's international operations "directly," and that "the evidence shows that the Director and Officer Defendants made substantial efforts, continuing well after the signing of the Walmart APA and into February 2019 when the bill of sale was signed, to sell the international assets, approaching something on the order of 17 potential buyers." Plaintiffs then argue it is "absurd" that "Defendants' unsworn professed assertions . . . overcame" what plaintiffs contend were certain of the SLC's admissions at trial. But plaintiffs set forth *none* of the evidence relied on by Judge Borkon in reaching his conclusions—favorable or unfavorable—nor do they " '*show how and why it is insufficient.*' " (*Schmidlin v. City of Palo Alto*, *supra*, 157 Cal.App.4th at p. 738.) And on appeal, we do not revisit the trial court's evaluation of defendants' credibility or its decisions regarding how to

weigh the evidence.  (See *In re Caden C.* (2021) 11 Cal.5th 614, 640 ["In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' "].)

In short, an appellant who "challenges the sufficiency of the evidence to support a trial court finding" bears a "daunting burden."  (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329.)  Plaintiffs have not even attempted to carry that burden here.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A172889N)